UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

AMERICAN MEDICAL FACILITIES
MANAGEMENT, LLC, d/b/a AMFM,

       Plaintiff,

v.                         Civil Action No. 2:21-cv-00400

AARON & GIANNA, PLC; DEWAYNE
L. WILLIAMS; VETCOMM, LLC;
TERRY READO; DERON BROWN; and
OSTEOBIOLOGIC SOLUTIONS, INC.,

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending are defendants Aaron & Gianna, PLC's ("A&G"),
and DeWayne Williams' ("Williams") motions to dismiss, both
filed December 14, 2021, based on lack of personal jurisdiction
and improper venue.

I. Background

       Plaintiff American Medical Facilities Management, LLC,
d/b/a AMFM ("American") is a West Virginia limited liability
company that "owns and operates medical facilities in the state
of West Virginia," where it provides nursing, rehabilitation,
and long-term care services.  Verified Amended Complaint ("V.

Am. Compl.") ¶ 1, ECF No. 12.[1]  A&G is a Louisiana professional law corporation with its principal place of business in Louisiana.  Id. ¶ 2.  Williams is an attorney licensed and residing in Louisiana and is "an agent, employee, partner, member, shareholder, treasurer, and member of the board of directors of Aaron & Gianna."  Id. ¶¶ 3-4.

In the early onset of the coronavirus disease 2019 ("covid") pandemic "in March of 2020," supplies of personal protective equipment ("PPE") such as masks, gowns, and gloves were scarce.  Id. ¶ 16.  American was "in a desperate state to acquire . . . PPE" to protect its patients and workers.  Id. ¶¶ 18, 20.  "[A]t some point prior to April 14, 2020," defendant Osteobiologic Solutions, Inc. ("Osteobiologic"), contacted American to solicit and market PPE supplies "at market prices significantly above pre-pandemic levels."  Id. ¶ 19.  American agreed to buy "20,000 N95 Masks, 20,000 surgical masks, 25,000 gowns, 5,000 coveralls and 40,000 nitrile exam gloves" for a total price of $364,600.  Id. ¶ 20-22; see also Order Form, V. Am. Compl. Ex. A, ECF No. 12-1.  The order form stated that 100% of payment was due upon order.  V. Am. Compl. ¶ 23; Order Form,

---

[1] Unless otherwise stated, the facts described herein are taken from the verified amended complaint and attached materials, and are taken as true for purposes of Williams' and A&G's motions. Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016).

V. Am. Compl. Ex. A.  In addition, the order form identified defendant Vetcomm, LLC ("Vetcomm"), as the vendor.  Order Form, V. Am. Compl. Ex. A; <u>see also</u> V. Am. Compl. ¶¶ 21, 23. Osteobiologic is a Texas corporation with its principal place of business in Texas, V. Am. Compl. ¶ 8.  Vetcomm is a limited liability company with members in Texas and Louisiana, <u>id.</u> ¶¶ 5-7.

Because of the order's size and "the atypical supply chain being used, American was hesitant to purchase the[] supplies from" Vetcomm and Osteobiologic.  <u>Id.</u> ¶ 28.  Thus, Vetcomm and Osteobiologic represented to American that Williams and A&G, neither of whom were otherwise known to American, were their escrow agents "for purposes of holding money, in trust, to secure the transaction."  <u>Id.</u> ¶¶ 29, 31.  Williams had directed Vetcomm and Osteobiologic to direct potential buyers to him and A&G for escrow services related to PPE purchases.  <u>See id.</u> ¶¶ 30, 32.

On April 15, 2020, American's president spoke with Williams by telephone concerning the proposed purchase of PPE. <u>Id.</u> ¶ 33; <u>see also</u> April 15 Email, V. Am. Compl. Ex. B, ECF No. 12-2.  During that conversation, Williams "proposed serving as an 'escrow agent' for the proposed transaction and promised to hold sums transferred to him in trust, in his firm's client

trust account, until the fulfillment of the proposed PPE order by" Vetcomm and Osteobiologic.  V. Am. Compl. ¶ 34.  On April 15, 2020, Williams emailed American's president as follows:

> It was a pleasure speaking with you this morning.  As we discussed, Aaron & Gianna, PLC is the Escrow Agent for Vetcomm, LLC in connection with PPE orders.  Thank you for supplying the order form.  We will advise Vetcomm of our discussion, and advise when the $364,600 have been wired into [our] account.  Rest assured that we will hold the funds in escrow until Vetcomm instructs fulfillment and will so advise you of same for comment if necessary.

April 15 Email, V. Am. Compl. Ex. B.  "In reliance of representations made by" Williams, A&G, Vetcomm, Osteobiologic, and agents of Vetcomm and Osteobiologic, American transferred the escrow funds of $364,600 "on April 15, 2020, to an account owned or controlled by Aaron & Gianna."  V. Am. Compl. ¶ 41.

From April 21 through May 6, 2020, Williams and A&G "made a series of illicit transfers" of the escrow funds to various entities for purported fulfillment of PPE orders.  Id. ¶ 42; see also id. ¶¶ 43-50 (describing the specific transfers); Fund Transfers List, V. Am. Compl. Ex. C, ECF No. 12-3. Ostensibly, those various entities were vendors selected by Vetcomm or Osteobiologic to fulfill the PPE orders.  See V. Am. Compl. ¶¶ 42-50; Funds Transfers List, V. Am. Compl. Ex. C. Williams and A&G "did not consult or seek approval from" American for those transfers, did not determine whether the

4

orders had been filled, and did not inquire of American whether the orders had been filled. <u>See</u> V. Am. Compl. ¶¶ 43-50. Ultimately, Williams and A&G transferred $229,664 of the escrow funds to a number of different entities, leaving a remaining balance of $134,936. <u>Id.</u> ¶¶ 50-51; <u>see</u> <u>also</u> Funds Transfers List, V. Am. Compl. Ex. C. American alleges that it "has only received 20,000 surgical masks at a cost of $25,000.00." V. Am. Compl. ¶ 51.

     On May 28, 2020, American's president contacted Williams to cancel the undelivered portion of the purchase order and seek the immediate return of the corresponding escrow funds, totaling $339,600. <u>Id.</u> ¶ 57. Williams responded that the remaining escrow funds would be returned the next day, but the funds were not returned. <u>Id.</u> On June 9, 2020, American again contacted Williams about return of the remaining escrow funds. <u>Id.</u> ¶ 58. In response, "Williams notified [American] for the first time that the balance . . . had been depleted to $134,936." <u>Id.</u> American "questioned why he made unauthorized transfers . . . without the consent of [American]." <u>Id.</u> ¶ 59.

     Williams responded by email as follows:

> Thank you for your email. Our firm operated as Escrow Agent for Vetcomm and performed all transactions at the specific instruction of Vetcomm. We had no Escrow Agreement or privity of contract with [American] requiring notice of expenditures or approval by [American], although that was an aspiration if

necessary.  Conversely, we had an agreement with
Vetcomm to perform transactions as specifically
directed and when specifically directed.  We followed
those directions as given and have provided you with a
Reconciliation of those transactions.  We were always
told that the expenditures were to secure the products
you ordered, and still have no reason to believe
otherwise.  We were never told, nor provided
documentation, that [American's] approval of
expenditures was required or necessary before we could
release funds.  If you have documentation to the
contrary, please provide same at your earliest
convenience.

We advised Vetcomm that we were returning the
remaining funds in our account ($134,936.00) to you
based on your request.  Vetcomm acknowledged same and
indicated that it would be requesting a refund on your
behalf from the vendors paid.  Our firm has never
received any payment at all in this matter, and has in
fact likely incurred wiring fees for the various
transactions without reimbursement.  Thus, no
expenditures were made to Aaron & Gianna, PLC at all
requiring a refund.

As stated in my previous email, I am copying Vetcomm
on this transmission for follow-up.  You may reach out
to Vetcomm directly to resolve this issue.  Should any
refunds on this matter be deposited into Aaron &
Gianna, PLC's account, we will wire those funds back
to you and waive all wiring fees.  However, it is
Aaron & Gianna's position that it has not violated any
agreement regarding the release of any funds in this
matter.  All expenditures were made at the specific
direction of Vetcomm, and A&G was never provided any
documentation indicating that [American's] approval
was required or necessary to release any funds.
Again, if you have documentation to the contrary
please provide same.

June 9, 2020, Email, V. Am. Compl. Ex. D, ECF No. 12-4.

        "On or about June 11, 2020," Williams and A&G

transferred to American the remaining funds of $134,936.  V. Am.

6

Compl. ¶ 62.  This suit followed with the filing of the initial complaint on July 14, 2021.  ECF No. 1.  After Williams and A&G each moved to dismiss the complaint, ECF Nos. 5, 7, American filed the verified amended complaint on November 12, 2021, ECF No. 12.

American alleges that Williams and A&G, together with Vetcomm and Osteobiologic, induced American to transfer the escrow funds "knowing that they would neither hold the funds in trust and/or knowing that the funds would not be used to purchase PPE pursuant to the proposed PPE order."  V. Am. Compl. ¶ 40; see also id. ¶ 60.  American claims that the defendants "jointly[] had a plan or scheme to obtain payment for items of PPE with no intention to fulfill such orders, but instead convert [American's] funds in furtherance of their joint venture."  Id. ¶ 55.  Furthermore, American alleges that Williams and A&G should have "question[ed] the transfers purportedly directed by Vetcomm," id. ¶ 61, and not transferred the escrow funds, see id. ¶¶ 52-54.

American advances seven counts against Williams and A&G[2]: (1) joint venture, id. ¶¶ 66-70; (2) breach of contract,

---

[2] American also brings causes of action against Osteobiologic, Vetcomm, and Vetcomm agents Terry Reado and Deron Brown.  See generally V. Am. Compl.  In addition, American originally named Osteobiologic agent Robert Bundy as a defendant but has since

id. ¶¶ 71-89; (3) professional negligence, id. ¶¶ 90-98; (4)
breach of fiduciary duty, id. ¶¶ 99-107; (5) unjust enrichment,
id. ¶¶ 108-13; (6) civil conspiracy, id. ¶¶ 114-19; and (7)
fraud, id. ¶¶ 120-26.  American seeks, inter alia, $206,664 in
unreturned escrow funds; foreseeable financial damages related
to the cost of procuring substitute PPE; and foreseeable
financial harms related to delays in acquiring PPE, such as
increased patient care and labor costs.  Id. ad damnum cl.
American also seeks punitive damages.  Id. ¶¶ 127-29.
American's president verifies "that the factual statements
contained in the Verified Amended Complaint, concerning
[himself], [his] activities, and [his] intentions are true and
correct, as are the factual statements concerning [American],
[its] activities, and [its] intentions."  Todd Jones
Verification (attached to V. Am. Compl.), ECF No. 12.

On December 14, 2021, Williams and A&G each moved to
dismiss the verified amended complaint.  ECF Nos. 47, 49.  Both
defendants argue that the court should dismiss the verified
amended complaint (1) for lack of personal jurisdiction under
Federal Rule of Civil Procedure 12(b)(2), and (2) for improper

---

stipulated to his voluntary dismissal without prejudice.  ECF
No. 28.

venue under Federal Rule of Civil Procedure 12(b)(3).  ECF Nos. 47, 49.

In support of their motions, Williams and A&G submitted the affidavits of defendant Deron Brown ("Brown"), Brown Aff., Williams Mem. Supp. and A&G Mem. Supp. Ex. A, ECF No. 47-1, 49-1, and of Williams, Williams Aff., Williams Mem. Supp. and A&G Mem. Supp. Ex. C, ECF No. 47-3, 49-3.  "[Brown] is the Managing Member of Vetcomm . . . ."  Brown Aff. ¶ 2.  He avers that neither Williams nor A&G were escrow agent "to the transaction or to [American]," that Vetcomm did not enter into a "three-party" escrow agreement, that A&G and Williams did not negotiate with any party "relative to being escrow agent," and that A&G and Williams did not grant anyone the authority to represent that they would serve as a purchaser's escrow agent. Id. ¶¶ 6-8.

Brown asserts that, instead, A&G and Williams were Vetcomm's "escrow agent solely for the purpose of being its Paymaster in connection with: (1) paying vendors to secure the product[] and then (2) distributing profit to [Vetcomm's] members after a successful transaction."  Id. ¶ 5.  Brown explains that Vetcomm directed A&G to pay vendors when Vetcomm was advised that payment was required to secure a product.  Id. ¶ 9.  In addition, Brown states that Vetcomm authorized A&G to

return the remaining escrow funds to American when it learned that American canceled its orders for lack of fulfillment.  Id. ¶ 11.  Last, Brown avers that neither Vetcomm nor A&G received compensation from the transactions underlying this civil action. Id. ¶¶ 13-14.

Williams avers that American contacted him, and that he confirmed to American that A&G was Vetcomm's escrow agent "for the purpose of acting as . . . Paymaster in connection with PPE transactions."  Williams Aff. ¶¶ 10-11.  Williams claims that American then sent him a quote it received from Vetcomm, for which Vetcomm asked A&G to "act as its Escrow Agent for the purposes of being its Paymaster." Id. ¶¶ 10-14.  Next, Williams states that American deposited money in its escrow account "for the benefit of Vetcomm."  Id. ¶ 15.  Williams asserts that A&G disbursed the escrow funds "at the explicit instruction and direction of Vetcomm . . . and was told by Vetcomm . . . that these disbursements were specifically for the PPE product and/or for services provided in connection with the procurement of the PPE product."  Id. ¶ 16.  Williams states that when American canceled the order and requested return of the remaining escrow funds, he immediately advised Vetcomm and returned the funds. Id. ¶¶ 18-19.

10

Williams claims that neither he nor A&G contracted with American.  Id. ¶ 9.  He avers that the escrow funds were held in a bank account in Louisiana, id. ¶ 8, and disclaims that he or A&G were compensated for their escrow agent services, id. ¶ 17.

On December 20, 2021, the court continued the pending deadline to serve Rule 26(a)(1) disclosures until the further order of the court.

## II. Motion to Dismiss Standards

### A. Rule 12(b)(2) -- Lack of personal jurisdiction

Rule 12(b)(2) permits a court to dismiss a complaint for "lack of personal jurisdiction."  Fed. R. Civ. P. 12(b)(2). Although a defendant must raise the challenge, the burden remains on the plaintiff to establish personal jurisdiction in the court at all times.  Grayson, 816 F.3d at 267.

"The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court."  Grayson, 816 F.3d at 268. Typically, a district court will evaluate a Rule 12(b)(2) motion "as a preliminary matter."  Id. at 267.  This preliminary phase

involves a review of "only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint." Id. at 268. The plaintiff's burden under these circumstances is that of showing a prima facie case of jurisdiction. Id. "When determining whether a plaintiff has made the requisite prima facie showing, the court must take the allegations and available evidence relating to personal jurisdiction in the light most favorable to the plaintiff." Id.; see also Sneha Media & Ent., LLC v. Assoc. Broad. Co. P Ltd., 911 F.3d 192, 196 (4th Cir. 2018). Whether a party has established a prima facie case of personal jurisdiction is a question of law. Hawkins v. i-TV Digitális Távközlési zrt., 935 F.3d 211, 226-27 (4th Cir. 2019).

B. Rule 12(b)(3) -- Improper venue

Rule 12(b)(3) permits a party to move to dismiss a complaint for improper venue. Fed. R. Civ. P. 12(b)(3). Generally, venue in the federal district courts is governed by 28 U.S.C. § 1391, which provides as follows in pertinent part:

> A civil action may be brought in . . . a judicial
> district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a
> substantial part of property that is the subject of
> the action is situated . . . .

28 U.S.C. § 1391(b)(2).

"To survive a motion to dismiss for improper venue when no evidentiary hearing is held, the plaintiff need only make a prima facie showing of venue." Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004). The district court may "consider evidence outside the pleadings" to determine whether venue is proper. Aggarao v. MOL Ship Mgmt. Co., Ltd., 675 F.3d 355, 365-66 (4th Cir. 2012). The district court should view the facts in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. See id. at 366; see also Jackson v. Payday Fin., LLC, 764 F.3d 765, 773 (7th Cir. 2014) (noting that "[t]his approach is consistent with that of other courts of appeals and commentators"). Venue may be proper in more than one district. Mitrano, 377 F.3d at 405. The plaintiff bears the burden of showing that venue is proper in the district court. C.H. James & Co. v. Fed. Food Marketers Co., 927 F. Supp. 187, 189 (S.D. W. Va. 1996).

## III. Discussion

### A. Personal jurisdiction

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." Daimler AG v. Bauman, 571 U.S. 117, 125 (2014) (citing Fed. R.

Civ. P. 4(k)(1)(A)).  As this court recently recognized, evaluating personal jurisdiction in West Virginia is a two-step process: deciding whether (1) West Virginia's long-arm statute authorizes jurisdiction and (2) the exercise of personal jurisdiction satisfies the due process clause of the Fourteenth Amendment.  Taylor v. Sethmar Transp., Inc., 2:19-cv-00770, 2021 WL 4751419, at *6 (S.D. W. Va. Oct. 12, 2021); see also State ex rel. Third-Party Defendant Health Plans v. Nines, 852 S.E.2d 251, 259, 259 n.9 (W. Va. 2020).

### 1. Long-arm statutes

West Virginia has two long-arm statutes, West Virginia Code §§ 56-3-33(a) and 31D-15-1501(d).  See Syl. Pt. 3, State ex rel. Ford Motor Co. v. McGraw, 788 S.E.2d 319 (W. Va. 2016). Relevantly, section 56-3-33(a) confers personal jurisdiction over a nonresident who "[t]ransact[s] any business in this state" or "[c]ontract[s] to supply services or things in this state," W. Va. Code Ann. § 56-3-33(a)(1), (a)(2) (West 2021, amended July 6, 2017),[3] and section 31D-15-1501(d) similarly

---

[3] Section 56-3-33(a) reaches nonresident defendants who engage in any of the following:

(1) Transacting any business in this state;

14

confers personal jurisdiction over a foreign corporation that
"makes a contract to be performed, in whole or in part, by any
party thereto in this state," id. § 31D-15-1501(d)(1) (amended
June 5, 2008).[4]

Viewing the facts alleged and evidence adduced in
American's favor, Williams, on behalf of himself and A&G and in
a telephone conversation with American's president, offered to
serve as the escrow agent for the proposed PPE transaction

---

(2) Contracting to supply services or things in this
state;

(3) Causing tortious injury by an act or omission in
this state; [or]

(4) Causing tortious injury in this state by an act or
omission outside this state if he or she regularly
does or solicits business, or engages in any other
persistent course of conduct, or derives substantial
revenue from goods used or consumed or services
rendered in this state . . . .

W. Va. Code Ann. § 56-3-33(a)(1)-(4) (subsections (5)-(7)
omitted as irrelevant).

[4] Section 31D-15-1501(d) applies only to foreign corporations
and, borrowing from section 56-3-33(a)(1), provides that a
foreign corporation "transact[s] business in this state if":

(1) The corporation makes a contract to be performed,
in whole or in part, by any party thereto in this
state[ or]

(2) The corporation commits a tort, in whole or in
part, in this state . . . .

W. Va. Code Ann. § 31D-15-1501(d)(1)-(2) (subsection (3)
omitted as irrelevant).

involving the West Virginia-based American and its West Virginia medical facilities.  American then sent the proposed PPE quote to Williams, who responded that he was in receipt of the quote and would notify Vetcomm about the discussion and when American deposited the escrow funds in A&G's account.  Thus, rather than a disinterested intermediary, Williams and A&G took an active role in soliciting and facilitating the transaction.  Indeed, according to the verified amended complaint, American was concerned about purchasing PPE from Vetcomm until it spoke with Williams, who alleviated American's concerns.  At that time, Williams apparently accepted American's order on behalf of Osteobiologic and Vetcomm.

Notably, other than the emails and alleged telephone conversations, none of the parties has produced a contract or other documentation of an escrow agency between A&G and any party.  Insofar as American and A&G had an agreement, the terms of such agreement are evidently comprised of the terms discussed over the telephone and via email, with A&G then located in Louisiana and American in West Virginia.  American alleges that Williams offered for A&G to serve as American's fiduciary and hold American's funds in escrow until fulfillment of the orders. Only then did American transfer the escrow funds to A&G. American alleges that A&G then illicitly siphoned off its funds

without its knowledge and before orders were fulfilled. American claims that all this was done with tortious intent to convert American's funds, in breach of the escrow agreement between it and Williams and A&G, in violation of Williams' and A&G's fiduciary duties, and in violation of Williams' and A&G's duties of professional conduct.

Neither party addresses West Virginia's long-arm statutes. Nonetheless, it is clear that American has made a prima facie case under both sections 56-3-33(a) and 31-15-1501(d). The facts, viewed in American's favor, show that Williams and A&G transacted business in West Virginia, contracted to supply things in West Virginia, and made a contract to be performed in West Virginia at least in significant part by a party thereto. <u>See</u> W. Va. Code §§ 31D-1501-15(d)(1), 56-33-3(a)(1), 56-3-33(a)(2). The long-arm statutes are satisfied.

### 2. Due process

The only avenue in this case for establishing personal jurisdiction consistent with due process is through specific jurisdiction. ECF No. 39 at 2-3 (American invoking only specific jurisdiction). To establish specific jurisdiction, a plaintiff must show "that the defendant purposely established

minimum contacts in the forum state such that it should

reasonably anticipate being haled into court there on a claim

arising out of those contacts." Sneha, 911 F.3d at 198. "This

'purposeful availment' requirement ensures that a defendant will

not be haled into a jurisdiction solely as a result of 'random,'

'fortuitous,' or 'attenuated' contacts, or of the 'unilateral

activity of another party or a third person.'" Burger King

Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). Yet, "even a

single act can support jurisdiction" if it "creates a

substantial connection with the forum." Id. at 475 n.18

(quotation marks omitted).

        The Fourth Circuit sets forth three factors to guide

the specific jurisdiction analysis:

>    (1) the extent to which the defendant purposefully
>    availed itself of the privilege of conducting
>    activities in the State; (2) whether the plaintiffs'
>    claims arise out of those activities directed at the
>    State; and (3) whether the exercise of personal
>    jurisdiction would be constitutionally reasonable.

UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 352 (4th Cir.

2020).

        American largely relies on the facts summarized above

in Part III.A.1, supra. ECF No. 39 at 5-8; see also ECF No. 63

at 2-3. American asserts that "the facts, as alleged . . . ,

establish that Vetcomm, LLC, Osteobiologic Solutions, Inc.,

DeWayne Williams and/or Aaron & Gianna, PLC worked together for

purposes of soliciting, fulfilling and transacting business to carry out transactions, including the sale and purchase of PPE." ECF No. 39 at 5.  American submits that those facts, out of which its claims arise, establish sufficient purposeful contacts with West Virginia by Williams and A&G to satisfy a constitutionally reasonable exercise of specific jurisdiction in this court.  The court agrees.

Taken as true, Williams and A&G reached into West Virginia by engaging in telephone and email communications actively to solicit and facilitate the PPE transaction with American, the performance of which would occur, in part, in West Virginia.  Part III.A.1, <u>supra</u> (complete recitation of relevant facts).  In addition, Williams and A&G contractually bound themselves to American by accepting the PPE purchase on Osteobiologic's and Vetcomm's behalf and, according to American, holding the escrow funds as American's fiduciary.  As American tells it, American would not have agreed to purchase the PPE without Williams' and A&G's assurances and fiduciary agreement. The following passage from the Supreme Court's decision in <u>Burger King</u> is particularly relevant to Williams' and A&G's alleged actions in this case:

> Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the

> privilege of conducting business there, and because
> his activities are shielded by "the benefits and
> protections" of the forum's laws it is presumptively
> not unreasonable to require him to submit to the
> burdens of litigation in that forum as well.
>
> Jurisdiction in these circumstances may not be avoided
> merely because the defendant did not physically enter
> the forum State.  Although territorial presence
> frequently will enhance a potential defendant's
> affiliation with a State and reinforce the reasonable
> foreseeability of suit there, it is an inescapable
> fact of modern commercial life that a substantial
> amount of business is transacted solely by mail and
> wire communications across state lines, thus obviating
> the need for physical presence within a State in which
> business is conducted.

471 U.S. at 475-76 (citations omitted).

Additionally, American's claims arise out of Williams' and A&G's activities directed at West Virginia.  And the court's exercise of specific jurisdiction is constitutionally reasonable because West Virginia has a substantial interest in resolving the allegedly tortious conduct targeting a West Virginia business, being one that involves a health care company's ability to respond to the covid pandemic in the State, and because American, in the interest of judicial economy, has an interest in resolving all of its claims arising out of the same conduct in the same forum.  See generally id. at 476-77 (discussing factors to consider under the constitutional reasonableness prong of analysis).  Thus, specific jurisdiction is proper in this court.

The thrust of Williams' and A&G's response is asking the court to reject the allegations of the verified amended complaint and instead to accept as true the affidavits of Brown and Williams.  See ECF No. 48 at 9-15; ECF No. 50 at 9-15; ECF No. 64 at 3-4.  The Fourth Circuit, however, instructs that at the preliminary stage of a Rule 12(b)(2) motion to dismiss taken up without a hearing, district courts should "give [a] plaintiff['s] allegations a favorable presumption" "even when the motion is accompanied by affidavits."  Sneha Media, 911 F.3d at 196.  "Of course, if the court denies a Rule 12(b)(2) motion under the prima facie standard, it can later revisit the jurisdictional issue when a fuller record is presented because the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following [the defendant's jurisdictional] challenge."  Id. at 196-97 (quotation marks omitted and alteration in original).  But at this stage and posture, the court cannot discard American's allegations as Williams and A&G request even in light of their affidavits.  Accordingly, the exercise of specific jurisdiction in this court satisfies due process.

B. Venue

As noted, 28 U.S.C. § 1391(b)(2) provides, in relevant part, that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." "[E]ven if a greater part of the events occurred elsewhere," "it is sufficient that a substantial part of the events occurred in" the district in which the complaint has been filed. Power Paragon, Inc. v. Precision Tech. USA, Inc., 605 F. Supp. 2d 722, 726 (E.D. Va. 2008). When deciding "whether events or omissions are sufficiently substantial to support venue" in the district, a court "should review the entire sequence of events underlying the claim." Mitrano, 377 F.3d at 405 (quotation marks omitted).

Williams and A&G take a narrow view of the facts in arguing against venue in this court. ECF No. 48 at 17; ECF No. 50 at 17. They focus on the fact that the escrow fund was "in a bank account in Louisiana at the time of the alleged wrongdoing asserted by Plaintiff," and then describe the alleged wrongdoing as the allegedly "improper transfer[]" of the funds "from that Louisiana bank account to other bank accounts not in West Virginia." ECF No. 48 at 17; ECF No. 50 at 17.

Viewing the facts in American's favor, American is a
West Virginia company that engaged with Osteobiologic and
Vetcomm for a proposed purchase of PPE for use in West Virginia.
While initially reticent to make a large purchase from an
unfamiliar supplier, American's concerns were alleviated through
discussions with Williams who, it is claimed, offered to serve
along with A&G as a fiduciary to ensure that Vetcomm fulfilled
its end of the bargain and who evidently accepted American's
purchase order on behalf of Osteobiologic and Vetcomm.  American
thus transferred the purchase money from West Virginia to
Louisiana, and upon its discovery of allegedly illicit transfers
of a substantial portion of that money, and after receiving only
a small part of the PPE ordered, demanded that A&G transfer the
remaining portion of the money back to American in West
Virginia, which Williams and A&G did.  In short, it is alleged
that Williams and A&G convinced a West Virginia company to
purchase PPE for use in West Virginia, accepted the West
Virginia company's purchase order, contracted with the West
Virginia company to hold its funds in escrow, illicitly
transferred the bulk of the West Virginia company's funds to
others not entitled to receive them, and then returned the
remaining portion to the West Virginia company.  These
connections to West Virginia are "substantial" under 28 U.S.C. §
1391(b)(2), and venue is proper in this court.

## IV. Conclusion

For the foregoing reasons, it is ORDERED that the motions to dismiss of A&G, ECF No. 47, and Williams, ECF No. 49, be, and hereby are, denied.  In addition, it is ORDERED that the previously filed motions to dismiss of A&G, ECF No. 7, and Williams, ECF No. 5, be, and hereby are, denied as moot.

The Clerk is requested to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: January 24, 2022

John T. Copenhaver, Jr.
Senior United States District Judge